IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VRG LINHAS AÉREAS S.A., ) | Case No. 1:11-cv-00198-MGC |
| Petitioner, ) | |
| v. ) | |
| MATLINPATTERSON GLOBAL ) OPPORTUNITIES PARTNERS II L.P., ) and MATLINPATTERSON GLOBAL ) OPPORTUNITIES PARTNERS ) (CAYMAN) II L.P. (U.S.A.), ) | |
| Respondents. ) | |

## DECLARATION OF CARLOS ALBERTO CARMONA

I, Carlos Alberto Carmona, hereby declare as follows:

1. I am a lawyer admitted to the Brazilian Bar Association, São Paulo section, since 1981, and currently a partner of the law firm Marques Rosado, Toledo Cesar e Carmona – Advogados. I am a professor of procedural law at the University of São Paulo Law School in both the undergraduate and graduate programs. I am a past president and a current director of the Brazilian Institute of Procedural Law (*Instituto Brasileiro de Direito Processual*). I was a member of the commission responsible for drafting the Brazilian Arbitration Law. Additionally, I am an expert in civil procedure, litigation and arbitration and have acted as an arbitrator in domestic arbitrations under the auspices of the *Centro de Arbitragem da Câmara de Comércio Brasil-Canadá*, the *Centro de Mediação e Arbitragem de São Paulo*, the *Fundação Getúlio Vargas*, the *Instituto de Engenharia*, and the *Câmara Internacional de Arbitragem de Minas*

00811.GL590/4042512.1
Error! Unknown op code for conditional.

1


Case 1:11-cv-00198-MGC   Document 58   Filed 12/03/13   Page 2 of 13

*Gerais* and international arbitrations under the auspices of the International Chamber of Commerce. I have published several books and articles on matters relating to arbitration law and practice.

2. I have reviewed the Final Award dated September 2, 2010 of the Arbitral Tribunal (the "Final Award"), in the case captioned as ICC No. 15372/JRF (the "Arbitration"), and the Partial Award of the Arbitral Tribunal dated April 7, 2009 (the "Partial Award"). I submit this declaration to address certain issues relating to the assertion that the Arbitral Tribunal exceeded its authority by adjudicating a claim beyond the scope of the submission to arbitration and thereby deprived Respondents MatlinPatterson Global Opportunities Partners II L.P. and MatlinPatterson Global Opportunities Partners (Cayman) II L.P. (together, "MP") of the opportunity to defend themselves with respect to the theory of incidental malice (*dolo de terceiro*) under Article 148 of the Brazilian Civil Code.

3. <u>Scope of Arbitration</u>. The Arbitration was governed by Brazilian arbitration law and applied Brazilian law to the issues raised by the parties. Under Brazilian law, the scope of the submission to arbitration is established by the limits of the controversy placed before the Tribunal, which are defined by the factual bases for a claim and the requested relief.

4. In the Arbitration, the scope of arbitration was defined in the Terms of Reference, in which the Tribunal undertook to decide all of the litigious issues raised by the "requests for relief and claims" ("*pedidos e pretensões*"). Such claims and requests for relief were set out in the Terms of Reference and could also be raised in subsequent filings made by the parties (Paragraph 43). I note that the Tribunal was authorized to consider other litigious issues, beyond those listed in the Terms of Reference, so long as they were properly raised during the course of the arbitration proceedings, without violating Article 19 of the ICC Arbitration Rules. It is clear

00811.GL590/4042512.1
Error! Unknown op code for conditional.

2



from a review of the Final Award that the Tribunal decided litigious issues that it was authorized to consider and that were properly made the subject of the Arbitration.

5. MP's challenge to the Final Award is based on the assertion that the scope of the Arbitration was somehow limited to an "alter ego claim" of VRG Linhas Aéreas S.A. (as successor in interest of GTI S.A., "VRG") against MP.[1] As set out in the Terms of Reference, however, the scope of the Arbitration was not so limited. Instead, the scope of the arbitration in relation to MP was defined by certain factual claims regarding MP's misconduct with respect to its direct participation during negotiations and after the signing of the Purchase and Sale Agreement dated March 28, 2007 (the "Agreement") and to its exercise of control over Volo do Brasil S.A. ("Volo DB") and Variglog S.A. ("VLog") during those negotiations and thereafter. These factual claims served as the basis for VRG's request that MP and Volo Logistics LLC ("Volo LLC") be held jointly and severally liable for the obligations assumed by Volo DB and VLog to pay a certain price adjustment under the Agreement.

6. As specifically set out in the Terms of Reference, the claims of VRG included numerous factual allegations of misconduct by MP, including misusing MP's control over Vlog and Volo DB during the course of negotiations for the purchase of VRG by GTI from Volo DB and VLog, undercapitalizing and fraudulently depriving VLog of assets that might allow it to satisfy its obligations to VRG, depriving VLog of independent management, commingling assets of VLog with the assets of MP and its affiliates, and intentionally frustrating and causing VLog to frustrate the purchase price adjustment process. (Arteaga Decl., Exh. 13, at ¶¶ 21-27.) During the course of the proceedings, the Arbitral Tribunal issued orders to prevent and obstruct actions taken by VLog to distribute its remaining assets to MP. Also during the course of the

---

[1] In fact, there is no such thing as an "alter ego claim" under Brazilian law. The theory of the disregard of the corporate entity is a legal basis for liability, not a claim in itself.

00811.GL590/4042512.1
Error! Unknown op code for conditional.

3



proceedings, VRG produced evidence specifically demonstrating, as set out in the Final Award, that MP used its control over VLog to prepare false financial statements that were the basis for GTI's decision to pay a US$275 million purchase price for VRG and that the false financial statements were in fact prepared by MP's executive and partner, Lap Chan. I understand that MP does not claim, and did not claim during the arbitration proceedings, that any of the factual bases for the Final Award, including the allegation that MP representatives committed an accounting fraud by their own actions and through VLog, were improperly raised by VRG or improperly considered by the Tribunal.

7. Also as specifically set out in the Terms of Reference, VRG's request for relief, with respect to MP, was that the Tribunal should "condemn the Respondents [including MP] to pay the amount that may be determined by the Tribunal" upon the completion of the price adjustment process (Arteaga Decl., Exh. 13, at ¶ 29(ii)), , or, in a subsidiary fashion, if the Tribunal declined to conduct the price adjustment process itself, to "declare that Respondents 3 and 4 [i.e., MP] will be liable to [the purchaser] for the claims" resulting from the price adjustment process (*id.* at ¶ 29(iii)).

8. Given the Terms of Reference, it is entirely within the scope of an arbitration that the Tribunal should have applied the relevant provisions of applicable Brazilian law to determine whether VRG was entitled to hold MP liable for the price adjustment payments. Nothing in the Terms of Reference states or suggests a limitation on the power of the Tribunal to consider more than one legal theory to resolve that controversy. As it relates to the potential liability of MP, the Terms of Reference were open-ended and allowed the Tribunal to fit the facts proved in the Arbitration to Brazilian law under all potentially applicable legal theories, giving a legal

00811.GL590/4042512.1
Error! Unknown op code for conditional.

4



qualification to the facts alleged by the parties (*qualificação jurídica dos fatos alegados pela parte*).

9. I understand that MP argues that, under Brazilian law, a claim under a theory of *dolo de terceiro* under Article 148 of the Brazilian Civil Code was outside the scope of the Arbitration as defined by the Terms of Reference. I disagree with this conclusion. The Terms of Reference make no pretense of discussing in an exhaustive fashion the legal theories upon which the requested relief might be awarded against MP, given the factual allegations raised by the parties. In fact, the claims and requests for relief do not cite any statutory provision of Brazilian law, or suggest reliance on a single theory of law. Nor were they required to do so. As noted above, the Tribunal was fully empowered to consider and apply any legal theory it deemed proper to resolve the controversy as initially defined by the Terms of Reference, and under Brazilian practice no party can legitimately claim to have been surprised that the Tribunal did exactly that.

10. As further background, I also note that the Brazilian Civil Code, in the civil tradition, enunciates fundamental legal concepts of Brazilian Civil Law and also provides detailed guidance on their application to specific circumstances.

11. Consistent with this overarching organization of the Brazilian Civil Code, Articles 145 to 150 are some of roughly three dozen provisions of the Brazilian Civil Code that specifically mention the word *dolo* and attribute legal consequences to action taken with *dolo*. *Dolo* may be translated as acting maliciously to mislead or defraud another party. As is clear from the Terms of Reference and the evidence adduced before the Tribunal, VRG undeniably argued and adduced evidence throughout the Arbitration that MP acted maliciously to defraud VRG. In the Final Award, the Tribunal ruled that MP had in fact committed accounting fraud by

00811.GL590/4042512.1
Error! Unknown op code for conditional.

5



manipulating the financial statements of VRG, as admitted by a partner of MP who had overseen the acquisition of VRG and its subsequent sale to GTI.

12.   Accordingly, the basic notion of *dolo*, i.e., maliciously seeking to mislead or defraud, was properly before the Tribunal at all times. Whether or not VRG itself specifically raised Article 148 as a basis for decision by the Tribunal does not affect the nature of the controversy or the resulting scope of arbitration.

13.   I would further add that, under Brazilian arbitration law, an arbitration clause as broadly worded as Section 14 of the Agreement (which includes disputes "resulting from or related to this Agreement or its validity, interpretation, fulfillment, or execution") will normally be deemed to submit to the arbitrators an issue of liability for malice. Under Section 14 (Arteaga Decl., Exh. 1), the Arbitral Tribunal was fully authorized to consider a claim for damages resulting from accounting fraud committed by MP during the negotiations leading up to the execution of the Agreement.

14.   <u>Surprise and Opportunity to Present its Case</u>. I understand that MP claims that, even if the Tribunal were authorized to apply a legal theory that had not been raised by the parties to resolve the controversy, the Tribunal failed to provide an opportunity for MP to address the legal theory of *dolo de terceiros* under the section of the Brazilian Civil Code relating to *dolo*.[2] MP further claims that such failure deprived it of a reasonable opportunity to present its case and violated due process requirements of the New York Convention. I disagree that the New York Convention required any such opportunity to be given to MP, considering the procedural rules and safeguards afforded to MP in the Arbitration by the Tribunal under Brazilian arbitration law.

---

[2] In the title preceding Paragraph 609, the Final Award refers to Articles 145 and the following provisions ("Os art. 145 e ss CC: o dolo").

00811.GL590/4042512.1
Error! Unknown op code for conditional.

6



15.  A fundamental principle of Brazilian arbitration law, incorporated in its art. 21, §2, is that due process is assured to parties in arbitration proceedings. Nonetheless, parties to an arbitration governed by Brazilian law should expect due process to be expressed under Brazilian procedural rules.[3]

16.  Due process, under Brazilian law, subsumes, among other rules and principles, the principle of the contradictory proceedings (*princípio do contraditório*), which requires each party to be afforded an opportunity to respond to the arguments of the other party and to express its views on any relevant fact, document, or element of evidence placed before a tribunal.[4] However, a party is not automatically entitled under Brazilian arbitration law to be given an opportunity to address legal theories properly raised by the factual allegations of the parties. Under Brazilian arbitration law, an arbitral tribunal is free to fit Brazilian law to the facts before it and to enter an award based on applicable Brazilian law regardless whether or not the specific statutory provision or legal doctrine was expressly cited or relied upon by one of the parties. This is a fundamental and well known aspect of Brazilian practice.

17.  In fact, the general rule in a Brazilian arbitration is that parties should assume and expect that a tribunal will apply the relevant law to the facts pleaded by each party. This rule is typically referred to in Brazil and other Civil Law countries by the Latin phrase "iura novit curia," which means that the court (as opposed to the parties) is charged with applying the law. The Final Award explicitly applies the law to the facts in Paragraphs 625 to 638, under the title

---

[3] I understand that MP does not dispute that the Arbitration was governed by Brazilian arbitration law.

[4] The Tribunal was careful to take account of the requirements of due process throughout the proceedings. For example, the Tribunal asked the parties, at the end of the evidentiary hearings, to acknowledge that the proceedings had been conducted in full compliance with the requirements of due process and the principle of contradictory proceedings. All parties acknowledged that the proceedings had been conducted properly.



"Fitting the facts to the concept of malice" ("Encaixe dos fatos no conceito de dolo"). This aspect of the Final Award is fully consistent with Brazilian practice.

18.  MP argues that, in doing so, the Tribunal surprised the parties. Under Brazilian arbitration law and procedure, the Tribunal's imposition of liability under a theory of *dolo* should have been no surprise, as the facts that were argued in the Terms of Reference and detailed during the Arbitration clearly raised the issue of *dolo*. It is uncontroversial under Brazilian law that parties bear the burden of identifying and discussing the legal theories that may be raised by the factual allegations of other parties.[5] The failure of a party to consider a legal theory ultimately applied by a court or tribunal does not vitiate the proceedings or violate the rights of any party, so long as the legal theory was properly raised by the limits of the controversy as presented to the court or tribunal.

19.  In my opinion, as a matter of international arbitration as practiced in Brazil (and setting aside the application of domestic Brazilian arbitration law), MP could not have been unfairly surprised by the Final Award's application of *dolo* as a basis for liability, given the context, the matters in dispute, and the procedural rules applicable to the arbitration.

20.  *Context*. The relevant context for evaluating a claim of unfair surprise includes the operating assumptions of parties and their counsel. MP was represented by highly-qualified Brazilian counsel from the outset. I understand that MP specifically argued that the Arbitration should be conducted pursuant to Brazilian arbitration law and that the controversy should be resolved pursuant to Brazilian substantive law. The other parties to the Arbitration were also

---

[5] This understanding is corroborated by the following Brazilian precedents, among several others: REsp 1.007.692-RS, STJ, 3ª Turma, rel. Min. Nancy Andrighi, j. 17.08.2010; RE 105.637-PE, STF, 1ª Turma, rel. Rafael Mayer, j. 30.08.1985; REsp 582.421-MS, STJ, 3ª Turma, rel. Min. Humberto Gomes de Barros, j. 12.04.2005; REsp 711.644-SP, STJ, 4ª Turma, rel. Min. Luis Felipe Salomão, j. 15.12.2009; REsp 1.009.057-SP, STJ, 3ª Turma, rel. Min. Vasco della Giustina, j. 27.04.2010.



represented by Brazilian counsel throughout the proceedings. MP and its counsel could have and should have anticipated that the Tribunal would consider itself to be empowered to apply the relevant Brazilian law to resolve the controversy. If MP was, in fact, taken by surprise, then such outcome may have been the intentional result of a tactical decision of MP to avoid discussing other potential legal theories. Indeed, as the Tribunal concluded in the Final Award, MP made a tactical decision during the Arbitration to direct its attention to the facts rather than to potentially applicable legal theories. (Arteaga Decl., Exh. 33, at ¶ 612.) Having made such a tactical decision, MP cannot, under Brazilian practice, complain about the legal theory that the Tribunal concluded fit the facts as proved during the Arbitration or attack the Award on the basis of surprise.

21. *Matters in dispute.* The matters in dispute were numerous allegations of misconduct by MP, including the accounting fraud recognized by the Tribunal based on the admissions of MP's representative, Lap Chan. This unlawful conduct raised the prospect of liability under a number of legal theories under Brazilian law, and Brazilian law plainly permitted the Tribunal to select the legal theory that it concluded was most applicable to the facts that it found to exist based on the parties' evidence and arguments.

22. Ultimately, the Tribunal disagreed with the principal legal theory raised by VRG to establish the liability of MP. The Tribunal, while acknowledging that VRG had repeatedly claimed fraud (*id.* at ¶ 604), concluded that the technical requirements for piercing the corporate veil had not been met, on the grounds that MP had not misused the corporate form of Volo DB and VLog or commingled their assets (*id.* at ¶ 607). The Tribunal then proceeded to apply another legal theory to resolve the controversy and held MP liable under a theory of extracontractual liability for unlawful conduct, citing Articles 146 and 148 of the Brazilian Civil

00811.GL590/4042512.1
Error! Unknown op code for conditional.

9



Code. In so doing, the Tribunal acted consistently with Brazilian arbitration practice; its decision could not have come as a surprise and certainly did not deprive MP of due process under Brazilian law.

23. *Procedural rules.* The procedural rules applicable to the Arbitration included the Brazilian procedural principles set out in, or applicable pursuant to, the Brazilian arbitration law.

24. *Ability to Mount a Case.* MP argues that the requirements for liability for *dolo* under Articles 146 and 148 were vastly different from the requirements for piercing the corporate veil and that it would have mounted a different case to defend against a claim based on *dolo*. I disagree that MP was unable to mount such a case during the Arbitration, if it had taken adequate precautions and tried to anticipate legal theories that a court or tribunal might apply to the factual allegations of fraud. In its final argument, MP revealed that it understood this burden and claimed broadly and simply that, "*[a]s shall be demonstrated in detail hereinafter, there are no factual or legal grounds for extending the liability for any possible price adjustment to*" MP. (Arteaga Decl., Exh. 32, at ¶ 17.) It was incumbent on it to address all potential legal theories for liability raised by the factual allegations of VRG.

25. Furthermore, I have reviewed the Final Allegations of MP and conclude that MP in fact did address the requirements under Brazilian law for a case implicating *dolo de terceiro*. It denied that the misconduct (i.e., accounting fraud) actually took place or was intended.

26. For example, MP argued that, "*[t]he negotiation of the Agreement was transparent and made clear to each signatory party, the risks that they were incurring.*" (*Id.* at ¶ 7.) It claimed that Lap Chan was not the sole person negotiating the agreement, and that the final terms could not be attributed to him alone, asserting that, "*[t]he evidence gathered during this proceeding confirms that there were new draft versions of the Agreement on [March] 20th,*

00811.GL590/4042512.1
Error! Unknown op code for conditional.

10



*21st, and 22nd, until they arrived at the final version, which was signed on March 28, 2006. In other words, after Mr. Lap Chan's travel [out of São Paulo] there were four more drafts before arriving at the Agreement.* (*Id.* at ¶ 38.)  MP further argued that, "*[i]t is evident that, with the investment of so much capital in one transaction in Brazil, [MP] could not be completely absent in the negotiation of a US$ 275 million contract. There is an enormous chasm between that and the allegation that said participation would mean the total sole involvement of [MP] (and not [Variglog]), so as to deceive Plaintiff.*" (*Id.* at ¶ 73.) And MP asserted that, "*[t]he testimony by Mr. Lap Chan confirms that this work on Appendix III [i.e., the balance sheet at issue] was done by PwC and KPMG, in the presence of Mr. Marcio Nobre.*"[6] (*Id.* at ¶ 96.)

27.     MP denied that VRG had relied on the balance sheet that had been manipulated. For example, MP argued that, "*[d]uring the hearing it was made clear that the value of the transaction was based upon VRG's principal asset, which were the slots at the Congonhas Airport. The price was adjustable according to the number of slots that would be acquired by the Gol Group.*" (*Id.* at ¶ 67.) According to MP, "*[t]he other terms and conditions of the Agreement also had an impact on the amount agreed by the parties. The Gol Group performed a risk analysis of the Agreement's terms and conditions, and the risks involved in it, prior to signing the Agreement.*" (*Id.* at ¶ 69.) MP claimed that VRG was advised by numerous advisors and could not have been fooled by the manipulated balance sheet, arguing that, "*[M]oreover, [the purchaser] conducted an ample due diligence in order to purchase VRG. The actual idea of a due diligence is a function of . . . the responsibility of the purchaser of a company to verify whether its accounts are in order and whether the price that it is paying reflects the value of the company. The Plaintiff had the opportunity to perform an ample accounting due diligence prior*

---

[6] Mr. Marcio Nobre, an accountant at VRG, was a key eyewitness of the accounting fraud.



to deciding to execute the Agreement. Therefore, the figures were carefully analyzed by Plaintiff, its in-house personnel and a battalion of lawyers and advisers." (Id. at ¶ 76.)

28. MP also argued that, even if the misconduct was proved, no damages resulted for VRG from the misconduct of MP because the price adjustment process would have rectified any misstatements contained in the manipulated balance sheet. For example, MP stated that, "Plaintiff was also unable to prove any connection between any conduct of [MP] and such loss as it allegedly sustained after the Agreement." (Id. at ¶ 14.) MP further argued that, "[i]n reality, if Gol experienced any trouble after VRG's acquisition [...], such trouble resulted from Gol's own business decisions. (Id. at ¶ 15.) And it claimed that, "[e]ven Mr. Marcio Nobre, who sought at all costs to distort the concept of Appendix III and depict it as [a]presumed fraud to deceive the Tribunal, eventually admitted that it was nothing but a working capital adjustment, when he was asked by the arbitrators." (Id. at ¶ 95.)

29. The fact that the Tribunal rejected these arguments does not mean that MP did not have an opportunity to make them.

30. I note that MP did argue that it would not receive a benefit from any misrepresentation, on the grounds that any purchase price adjustment would cure the effect of the misstated balance sheet. (Id. at ¶ 95.) It would have been implausible for MP to argue that it did not receive a benefit as a result of a sale of VRG by its effectively wholly-owned subsidiaries at a significant gain. The Tribunal addressed the issue of a benefit by stating "VRG's sale to Gol promised to be a transaction that would bring great benefits to the MatlinPatterson Fund, and therefore the latter was highly interested in having the transaction concluded successfully" (Id. at ¶ 627.)



00811.GL590/4042512.1
Error! Unknown op code for conditional.

12

31. In conclusion, in my opinion, the arbitral Tribunal did not exceed the scope of the arbitration by assigning liability to MP for accounting fraud, as had been properly argued and proved by VRG during the Arbitration, and did not violate due process when it applied Articles 145 to 150 of the Brazilian Civil Code as the direct statutory basis for the liability of MP. In light of the factual allegations advanced throughout the Arbitration, MP cannot claim to have been unfairly surprised by the manner in which the Tribunal fit those facts to Brazilian law.

FURTHER DECLARANT SAYETH NAUGHT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2011

_____
Carlos Alberto Carmona

00811.GL590/4042512.1
Error! Unknown op code for conditional.

13