IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VRG LINHAS AÉREAS S.A., | Case No. 1:11-cv-00198-MGC |
| Petitioner, | |
| v. | |
| MATLINPATTERSON GLOBAL OPPORTUNITIES PARTNERS II L.P., and MATLINPATTERSON GLOBAL OPPORTUNITIES PARTNERS (CAYMAN) II L.P. (U.S.A.), | |
| Respondents. | |

### DECLARATION OF GILBERTO GIUSTI

I, Gilberto Giusti, hereby declare as follows:

1. I am a partner of the law firm Pinheiro Neto – Advogados since 1993 in São Paulo, Brazil, and responsible for the arbitration sector that comprises preventive and litigious action in the civil, commercial and private domestic and international law sectors. I have gathered experience throughout the years in domestic and international commercial arbitration by conducting the discussion and implementation of arbitration clauses and commitments, and by actively participating both as an attorney and as arbitrator in arbitrations in Brazil and abroad. I am currently a member of the Court of the London Court of International Arbitration – LCIA and member of the Latin American Group of the International Arbitration Court of the International Chamber of Commerce – ICC. I am also a former member of the Board of the American Arbitration Association – AAA.



1

2. On March 28, 2007, Varig Logística S.A. and Volo do Brasil S.A., which I understand are two indirectly owned subsidiaries of Respondents MatlinPatterson Global Opportunities Partners II L.P. and MatlinPatterson Global Opportunities Partners (Cayman) II L.P. (together, "MP"), entered into an Agreement for the Purchase and Sale of the Shareholding Control of VRG Linhas Aéreas S.A. (the "Agreement"). The Agreement set forth, in Section 14, a broad arbitration provision that required that all disputes relating to the Agreement be resolved through arbitration.

3. MP was not a signatory to the Agreement. "MatlinPatterson" did, however, sign a document labeled "Aditamento SL/VRG/005," which specifically referenced the Agreement. A copy of "Aditamento 5" is attached as Exhibit 6 to the Declaration of Juan A. Arteaga that has been submitted to the Court in this case.

4. "Aditamento 5" is the fifth of six consecutively numbered documents – all titled "Aditamento" or "Aditivo" (which are synonyms) and bearing numbers 1 through 6 – executed in connection with the Agreement. The first five, including "Aditamento 5," were dated as of the same day that the Agreement was executed. The six documents are all structured and worded very similarly as letter agreements sent to Gol Linhas Aéreas Inteligentes S.A. ("Gol") and GTI S.A. ("GTI").

5. "Aditamento 5" is written in Portuguese. "Aditamento" or "Aditivo" may be translated into English as "addendum" or "amendment." In business transactions in Brazil, "Aditamento" or "Aditivo" are terms used to refer to any agreement to modify and/or amend and/or rectify and/or ratify a pre-existing agreement. I understand that MP has argued that a document labeled as an "Aditamento" is not an amendment but instead is a stand-alone "side letter." I respectfully disagree with this explanation. Based on my experience in Brazilian legal



and deal-making practice, an "Aditamento" (or an "Aditivo") is typically an amendment and, in any event, is not intended to constitute a stand-alone agreement.

5. Under Brazilian law, agreements are interpreted so as to give effect to the intention of the contracting parties. The intention of the contracting parties is most directly evidenced by the terms of an agreement, particularly in the case of agreements negotiated by sophisticated business persons advised by competent counsel. The interpreter of a contract governed by Brazilian law may consider any aspect of the contractual documentation in determining the scope of particular provisions. Furthermore, in construing an agreement, the interpreter should prefer an interpretation that gives meaning to contractual provisions over alternative interpretations that deprive contractual provisions of any effect, on the presumption that the parties crafted language that is not redundant or ineffectual.

6. In interpreting "Aditamento 5," the Tribunal properly noted that each of the six "Aditamento" or "Aditivo" (a) makes reference to a specific provision of the Agreement to modify or supplement it; (b) is countersigned under the heading "Agreed" by Gol and GTI; (c) has the same individuals signing as witnesses; and (d) contains the words "o presente instrumento constituirá de direito firme e válido compromisso entre as partes, inclusive aditando os termos do Contrato em epígrafe" – which MP translates into English as "the present instrument constitutes a firm and valid commitment by and between the parties, including for the purposes of supplementing the terms of the above-captioned Agreement" (Arteaga Decl., Exh. 6), and which may alternatively be translated as "a valid and enforceable agreement between the parties, including amending the terms of the above mentioned Agreement," (Devaney Decl., Exh. 9).



7. I understand that MP did not offer the Tribunal any alternative interpretation of the import of these provisions after "Aditamento 5" was raised as a basis for binding MP to arbitration in GTI's filing of October 22, 2008 (Arteaga Decl., Exh. 16, at ¶ 19) and prior to the Partial Award. In particular, MP filed its main reply brief on November 7, 2008 (Arteaga Decl., Exh. 22) and failed to address the issue entirely.

8. After considering the terms of the Agreement and having reviewed the drafting history, the Tribunal properly determined in the Partial Award (Arteaga Decl., Exh. 25) and in the dissenting arbitrator's opinion with respect to the Partial Award (Arteaga Decl., Exh. 26) that "Aditamento 5" had the effect of "integrat[ing]" MP "into the contractual relationship" formed pursuant to the Agreement and of binding MP to resolve disputes arising under the Agreement, including "Aditamento 5," by arbitration under Section 14 of the Agreement. I note that all three arbitrators, who were appointed by the International Chamber of Commerce, concurred in this conclusion.

9. The conclusion of the three arbitrators is fully supported by the express terms of "Aditamento 5," the overall structure of the transaction agreements, and applicable Brazilian law, which includes the civil law principle of good faith, under which "the contracting parties shall uphold the principles of diligence and good faith in executing and performing the agreement." (Civil Code, Section 422.)

10. By the express terms of "Aditamento 5," irrespective of its precise English translation, the effect of the second last paragraph of "Aditamento 5" can only be understood, as a matter of contractual construction under Brazilian law, deal-making practice and good-faith principle, as a modification of the Agreement so as to (a) include a non-compete obligation of MP within the scope of the Agreement and (b) expand the scope of the broad arbitration



4

agreement in Section 14 to encompass the resolution of disputes between other parties to the Agreement and MP.

11. The formula in "Aditamento 5" – "including amending the terms" or "including for the purposes of supplementing the terms" of the Agreement – is frequently used in Brazilian practice to signify that (i) the terms of the Agreement should be deemed modified as necessary to reflect the insertion of a new obligation into the Agreement, and (ii) the remaining terms of the Agreement not affected by the inserted modification should be deemed ratified. In Brazilian practice, the intent of such clauses is to allow the parties to the amendment to rely on the generally applicable provisions of the main agreement without having to reproduce (or, worse, renegotiate) such terms in the amendment. As a consequence, provisions relating to applicable law, dispute resolution, defined terms, and other key provisions of the main agreement – when not expressly altered by the contractual amendment -- are deemed ratified by the amendment and binding on the signatories thereto. Alternatively, but having the same effect, the generally applicable provisions of the main agreement can be deemed to have been incorporated into the amendment. In either case, the parties to "Aditamento 5" could only have intended (given the written expression of their intentions) that Section 14 be deemed ratified and encompassing disputes arising from the Agreement among the parties to "Aditamento 5."

12. Any other reading of the "including amending" or "including for the purposes of supplementing" formula would result in depriving "Aditamento 5" of any choice-of-law and dispute resolution provisions, among others, which would be unconscionable and unheard of in Brazilian practice in a transaction document relating to a US$275 million purchase of a major Brazilian airline. Current Brazilian business practice in international agreements negotiated by competent law firms is that all such agreements will necessarily contain choice-of-law and



dispute resolution clauses. "Aditamento 5" cannot be understood as a stand-alone agreement lacking a governing law and dispute resolution clause without assuming a gross departure from established Brazilian business practice and submitting the parties to an implausible degree of uncertainty regarding their rights and obligations under that instrument.

13. I further note that, if the "including amending" or "including for the purposes of supplementing" phrase were not deemed to modify the relevant terms of the Agreement and ratify its remaining terms, then it would be effectively emptied of any meaning. As noted above, it is an established canon of contractual interpretation under Brazilian law that contractual provisions should not be given interpretations that deprive them of any effect. It is apparent that the purpose of that phrase in "Aditamento 5" was to insert the choice-of-law and dispute resolution provisions of the Agreement into "Aditamento 5."

14. The overall structure of the transaction documents and "Aditamento 5" also support the conclusion of the Partial Award.

15. "Aditamento 5" is one of six sequentially numbered "Aditamentos" or "Aditivos" executed in connection with the Agreement. I note that the other "Aditamentos" and "Aditivos" modify certain core terms of a sale and purchase transaction. For example, "Aditivo 1" refers to Section 8 of the Agreement to broaden the scope of the indemnification obligations. "Aditivo 6" refers to Section 2.6 of the Agreement to contemplate a further basis for a potential price adjustment. Each of these amendments relied on the same formula – "including amending" or "including for the purposes of supplementing" the Agreement – to express the notion that these amendments were an integral part of the Agreement. If the construction of this key formula proposed by MP were correct, then these amendments would also lack a governing law and dispute resolution provision and any dispute arising from them would not be covered by the



arbitration agreement. It is plain that the parties to the amendments did not intend this result. As a result, the use of that phrase in the other "Aditamentos" or "Aditivos" confirms my opinion concerning the impact of that phrase in "Aditamento 5."

17. Another element of the overall structure of the transaction documents is that they use carefully defined terms throughout the Agreement and the amendments. Definitions for such terms are provided by the Agreement and are not reproduced in each amendment. "Aditamento 5" follows the pattern and employs a number of defined terms that can only be precisely understood by reference to the Agreement. For example, "Aditamento 5" uses the defined term "Affiliate" ("Afiliada") to limit the scope of the non-compete obligations of MP, which are the main object of "Aditamento 5." "Aditamento 5" also uses other defined terms, such as VRG, GTI, and ANAC. The only plausible explanation for the parties to "Aditamento 5" to have included defined terms from the Agreement to enunciate the non-compete obligations of MP is that the parties fully expected that the definitional section of the Agreement would apply to "Aditamento 5." By the same token, the parties must have intended other generally applicable sections of the Agreement, including Section 14, to apply to "Aditamento 5."

18. I note also that, under Brazilian law, the fact that the signatories to "Aditamento 5" do not include all of the signatories to the Agreement does not in any way affect my interpretation of "Aditamento 5." In reading "Aditamento 5," it is incumbent on the interpreter to give the amendment the effect intended by its parties, which is evidenced by the terms of the agreement and its overall structure. The intended effect of "Aditamento 5" is clearly to modify the Agreement as it pertains to the signatories to "Aditamento 5." Theoretically, the non-signatories to "Aditamento 5" might claim, implausibly, that they cannot be deemed to be bound



by "Aditamento 5." (I understand that they have not made any such objection.) MP cannot make such a claim and does not dispute that it is bound by "Aditamento 5."

19. Furthermore, as a matter of Brazilian arbitration law, a party may agree to arbitrate pursuant to a written agreement either containing an arbitration clause or referring to another document containing an arbitration clause (Article 4, Paragraph 1, of the Brazilian Arbitration Law). In both cases, the party is deemed a signatory of the arbitration clause and subject to the jurisdiction of the arbitral tribunal. Brazilian arbitration law requires a party to consent expressly to arbitration. In deeming MP to have agreed to arbitration as a signatory, the Partial Award was in accordance with Brazilian arbitration law. Significantly, the Tribunal concluded that MP had agreed to arbitrate by signing "Aditamento 5," and not because it found a legal basis for obligating MP to arbitrate as a non-signatory.

20. In conclusion, in my opinion, the Arbitral Tribunal's conclusion that, by signing "Aditamento 5," MP contractually agreed to arbitrate disputes with the purchaser under the Agreement is consistent with Brazilian law and should not have been surprising to persons familiar with Brazilian law and Brazilian deal-making practice.

FURTHER DECLARANT SAYETH NAUGHT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2011

_____
Gilberto Giusti